# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **CINDY POOR,** | ) |
| | ) |
| **Plaintiff,** | )   CIVIL ACTION |
| | ) |
| v. | )   No. 20-1094-KHV |
| | ) |
| **ANDREW M. SAUL,** | ) |
| **Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |
| _____ | ) |

## MEMORANDUM AND ORDER

Plaintiff appeals the final decision of the Commissioner of Social Security to deny disability and disability insurance benefits under Title II of the Social Security Act ("SSA"), 42 U.S.C. § 401, *et seq.*, and supplemental security income ("SSI") benefits under Title XVI of the SSA. For reasons stated below, the Court reverses the decision of the Commissioner and remands this case for further proceedings consistent with this order.

## Procedural Background

In February of 2017, plaintiff filed her applications for disability insurance benefits and SSI. On both applications, plaintiff claimed a disability onset date of October 19, 2016. Plaintiff's benefit applications were denied both initially and on reconsideration.

On April 11, 2019, an administrative law judge ("ALJ") concluded that plaintiff was not under a disability as defined in the SSA and that she was not entitled to benefits. See Administrative Record (Doc. #14-3) filed September 21, 2020 ("Tr.") at 593–607. On February 11, 2020, the Appeals Council denied plaintiff's request for review. Tr. 1–4. Plaintiff appealed to this Court the final decision of the Commissioner. The decision of the ALJ stands as the final decision of the Commissioner. See 42 U.S.C. § 405(g).

**Factual Background**

The following is a brief summary of the factual record.

Plaintiff is 53 years old. She has not engaged in substantial gainful activity since October 19, 2016, the alleged onset date. Plaintiff alleges that she is disabled because of asthma and degenerative disc disease of the cervical and lumbar spine.[1] Plaintiff has past relevant work as a packing and shipping clerk, telephone order clerk, wire cutter and hand-gluer. Tr. 606.

**I.    Medical Evidence And Disability Determination Reports**

Between the alleged onset date and April 11, 2019, the date of the ALJ decision, plaintiff has visited the emergency room at least ten times. During that same timeframe, plaintiff met with at least 16 different medical professionals, including at least 12 visits with PA Diana Marshall. During these visits, plaintiff complained of kidney stones, anxiety and depression, numbness and pain in her hands, left arm and left leg, neck pain, nausea and vomiting.

Importantly, on March 16, 2018, plaintiff had an MRI. Tr. 2987. It showed "[a]dvanced multilevel degenerative changes" to plaintiff's cervical spine. It also showed "spinal canal stenosis at multiple levels with significant spinal canal stenosis at C5–C6." Id. Finally, the MRI showed "compromise of neural foramen with nerve impingement at multiple levels." Id.

Three medical professionals, Dr. Gary Coleman, Dr. Manuel Salinas and PA Marshall, provided disability determination reports. Dr. Coleman and Dr. Salinas each provided one disability determination report while PA Marshall provided three. These disability determination reports are discussed in chronological order.

---

[1]    In her application to the Social Security Administration, plaintiff alleged she could not work because of depression, anxiety, asthma, osteoporosis, kidney disease, diabetes, fibromyalgia, back problems, hypertension, hip problems, headaches, ulcerative colitis and sleep apnea. Tr. 733. In her brief to this Court, plaintiff only discusses her asthma and degenerative disc disease of the cervical and lumbar spine.

On March 7, 2017, Dr. Salinas found that plaintiff "can lift, carry push and pull 50 pounds occasionally and 25 pounds frequently, sit about six hours in an eight-hour workday and stand and/or walk about six hours in an eight-hour workday [. . .], can occasionally climb, can frequently balance stoop and crawl, and must avoid concentrated exposure to extreme cold, extreme heat, humidity, vibration, fumes, odors, dusts, gases, poor ventilation and hazards such as machinery and heights." Id. at 605, 679–80, 691–92.

On the same day as Dr. Salinas, March 7, 2017, PA Marshall diagnosed plaintiff with kidney stones, depression and anxiety. Id. at 1239. PA Marshall found that plaintiff could never lift 60 pounds, could occasionally lift 20 pounds and could frequently lift 10 pounds or less. Id. PA Marshall also found that plaintiff could sit for eight hours, stand or walk for six hours and could walk for one to two city blocks before needing to rest. Id. Despite this finding, PA Marshall noted that plaintiff would need to lie down "in excess of the typical 15-minute break in the morning, the 30–60 minute lunch, and the typical 15-minute break in the afternoon" and that plaintiff would need to take unscheduled breaks during the workday. Id. PA Marshall stated that it was difficult to estimate how often plaintiff would need to take unscheduled breaks because plaintiff's "episodes are not predictable." Id. at 639. Finally, PA Marshall noted that plaintiff would need to be absent from work three or four times per month. Id. at 1240.

On July 1, 2017, Dr. Coleman found that plaintiff could "lift, carry, push and pull 20 pounds occasionally and 10 pounds frequently, sit six hours in an eight-hour workday, and stand and/or walk for six hours in an eight-hour workday." Id. at 604, 708. Dr. Coleman also noted that plaintiff could "frequently balance" but could only "occasionally perform other postural maneuvers" due to her "back limits." Id. at 604, 709. Finally, Dr. Coleman stated that plaintiff "must avoid concentrated exposure to extreme cold, extreme heat, humidity, vibration, fumes,

odors, dusts, gases, poor ventilation and hazards, such as machinery and heights." Id. at 604, 709–10.  Dr. Coleman explained that his opinion about how much plaintiff could lift differed from Dr. Salinas's opinion because, in the intervening time, plaintiff had an MRI that showed degenerative disc disease of the lumbar spine.  Id. at 710.  As a result, the amount plaintiff could lift was reduced from 50 pounds occasionally and 25 pounds frequently to 20 pounds occasionally and 10 pounds frequently.  Cf. id. at 691 with id. at 708; see also id. at 710.

On August 2, 2017, PA Marshall found that plaintiff had more limitations than she previously opined.  Specifically, PA Marshall found that plaintiff could frequently lift and carry 10 pounds, could occasionally carry 20 pounds and could never carry 50 pounds.  Id. at 2077.  PA Marshall found that plaintiff could frequently twist, stoop, balance, crouch, crawl, climb, reach, handle, finger and feel.  Id.  PA Marshall noted that plaintiff did not have limitations in reaching, handling and fingering.  Id.  PA Marshall noted that plaintiff could sit for 45 minutes before needing to switch positions, could stand for one hour before needing to sit or walk. And could stand for four hours in an eight-hour workday.  Id.

On October 29, 2018, PA Marshall further reduced the activities that plaintiff could perform.  Specifically, PA Marshall found that plaintiff could occasionally lift 10 pounds, but could never lift 20 pounds.  Id. at 3850.  PA Marshall also found that plaintiff could occasionally twist and stoop, rarely balance, crawl and climb, and never crouch.  Id.  Additionally, PA Marshall found that plaintiff had limitations with reaching, handling or fingering.  Id.  Specifically, PA Marshall found that plaintiff could frequently reach, but could only occasionally handle, rarely finger, and never feel.  Id.  PA Marshall noted that it was necessary for plaintiff to use a cane for imbalance, weakness and dizziness.  Id. at 3851.

In the medical source statement, dated October 29, 2018, PA Marshall also opined about

how plaintiff's limitations would affect ability to work.  Importantly, above the survey's question about unscheduled breaks, PA Marshall wrote "cannot work."  Id.  PA Marshall also stated that plaintiff was incapable of "low stress" work.  Id.  PA Marshall also noted plaintiff would need to take unscheduled breaks during an eight-hour workday due to muscle weakness, pain, paresthesia, numbness and chronic fatigue.  Id.  PA Marshall also found that plaintiff could stand for 10 minutes before needing to sit down or walk around and, in total, could stand for fewer than two hours in an eight-hour workday.  Id. at 3850.  PA Marshall found that plaintiff could sit for 10 minutes before needing to change positions and, in total, could sit for fewer than two hours in an eight-hour workday.  Id.  PA Marshall noted that plaintiff would be "off task or slower" for 25 per cent of a workday.  Id. at 3851.  Finally, PA Marshall stated that plaintiff would miss work or need to leave early more than four days per month.  Id.

## II.     Plaintiff's Testimony

On December 4, 2018, plaintiff testified in front of the ALJ.  Plaintiff testified that she had been losing feeling in her left side and that it had been getting progressively worse.  Id. at 636.  Plaintiff testified that her conditions had "gotten much worse" since the onset date.  Id. at 644.  Plaintiff originally stopped working because she had lower back and hip pain, trouble sleeping and difficulty standing or sitting for long periods.  Id. at 636–37.

Plaintiff testified about her current conditions.  Specifically, plaintiff testified that she had arthritis in her fingers and hands and that she had pain in her hands "pretty much all the time."  Id. at 638.  As a result, plaintiff can no longer play the guitar, write or open bottles for her mom, who lives with her.  Id. at 638–39.  Plaintiff testified that she had neuropathy in her feet and left hand stemming from her diabetes.  Id. at 639.  Plaintiff testified that she has asthma, for which she uses an inhaler.  Id. at 640.  Plaintiff testified that her breathing is affected by cold air, candles, cigarette

smoke, strong chemical smells and dust.  Id.  Plaintiff stated that she has ulcerative colitis which causes her burning and nausea every couple of days.  Id. at 644.  Plaintiff stated that the burning and nausea last approximately 45 minutes.  Id. at 645.

Plaintiff testified about the treatments which she uses for her conditions.  Specifically, plaintiff testified that she was using a cane and a walker, at the request of her doctors—although not prescribed by her doctors—to assist her movements.  Id. at 638.  Plaintiff stated that her medications make her dizzy and make it difficult for her to concentrate and understand things.  Id. at 641.  Plaintiff testified that as a result, she had to read a page two or three times to understand it.  Id. at 643.  Plaintiff testified that she now gets irritated quickly because she cannot do the things she used to do.  Id. at 642.

Plaintiff testified about the way her current conditions affect her abilities.  Specifically, plaintiff stated that she could stand for 15 to 20 minutes before needing to sit, sit for 15 to 20 minutes before needing to stand and that she could walk about half a block before needing to rest.  Id. at 640–41.  During the hearing plaintiff started in the seated position, stood and then sat down again.  Id. 637, 639.  Plaintiff stated that she felt like she could safely lift and carry less than 10 pounds and that when she tries to carry more than that she "pay[s] for it later."  Id. at 641.  Plaintiff testified that during a normal workday she would need to lay down at least twice for 30 to 45 minutes because of pain or fatigue.  Id. at 641–42.

Plaintiff also testified about her past work.  Most recently, plaintiff worked as a hand-gluer.  Id. at 649–50.  As a hand-gluer, plaintiff was not required to lift items because her employer provided assistance to her.  Id. at 650.  From 2013 until some point in 2016, before working as a hand-gluer, plaintiff worked as a newspaper photographer.  Id. at 651.  While working at the newspaper, plaintiff would occasionally move bundles of 25 newspapers.  Id. at 651–52.  From

2006 to 2012 plaintiff worked as a wire-cutter.  Id. at 653.  Plaintiff did not perform lifting as a wire-cutter.  Id. at 654.  Prior to working as a wire-cutter, plaintiff worked as telephone order clerk where she answered the phone and took down orders that customers called in.  Id. at 654–55.  As an orders clerk, plaintiff did not lift or carry anything.  Id. at 655.  Before working as a telephone orders clerk, plaintiff worked as a "floater" and performed a variety of tasks, including driving a fork truck, packing items for shipping and clerical work.  Id. at 655–66, 658.  Plaintiff would lift no more than 15 pounds when she worked as a floater.  Id. at 656.

**III.   Vocational Expert Opinion**

At the hearing before the ALJ, a vocational expert testified.  The ALJ posed four hypothetical individuals to the vocational expert.

First, the ALJ asked about a hypothetical individual who could lift and carry 20 pounds occasionally and 10 pounds frequently; could stand or walk six hours a day; could sit six hours a day; could occasionally climb, balance, stoop, kneel, crouch and crawl, but could not climb ropes, ladders or scaffolds; could not have exposure to hazardous conditions including heights or dangerous machinery; and could have no more than occasional exposure to pulmonary irritants, vibrations, or extreme changes in temperature or  humidity.  Id. at 660.  The vocational expert testified that this hypothetical individual could perform some of plaintiff's past relevant work.  Specifically, the vocational expert testified that this hypothetical individual could perform plaintiff's past relevant work as a hand-gluer, wire cutter and packing shipping clerk as these positions are described in the Directory of Operational Titles ("DOT").  Id. at 660–61.

The ALJ then posed a second hypothetical to the vocational expert.  This hypothetical person would be the same as the first hypothetical person but would need to change positions every 30 minutes during the workday.  Id. at 661.  When this hypothetical person switched positions, she

-7-

would not be off task.  Id.  The vocational expert testified that this hypothetical person could perform the past relevant work of a telephone order clerk as described in the DOT.  Id. at 661–62. The vocational expert was unsure whether this hypothetical individual could perform the past relevant work of a telephone clerk as plaintiff performed it because the expert was unsure whether the hypothetical person would be able to switch positions as needed.  Id. at 662.  The vocational expert did find, however, that this hypothetical individual could perform the occupations of document preparer, "order clerk, food and beverage" and addressing clerk.  Id.

The ALJ then posed a third hypothetical.  This hypothetical person would have the same limitations as the first two but would have additional symptoms including pain, fatigue and weakness that would affect the individual's ability to work consistently during a normal workday. Id.  As a result, this hypothetical individual would be off task 25 per cent of each workday.  Id. at 663.  The vocational expert testified that this individual's limitations would preclude full-time competitive work.  Id.

Finally, the ALJ posed a fourth hypothetical individual who would have the same limitations as the first and second individuals but would be absent from work three or more times each month.  Id.  The vocational expert testified that this would constitute "excessive absenteeism" and preclude full-time competitive work.  Id.  As the vocational expert noted later in her testimony, if a person "for any and all reasons is nonproductive for more than 15% of a day," then he or she is precluded from full-time competitive work.  Id. at 664.

## IV.     ALJ Findings

The ALJ denied benefits at step four, finding that plaintiff could perform her past relevant work. In her order of August 8, 2018, the ALJ made the following findings:

> 1.  The claimant meets the insured status requirements of the Social Security Act through March 31, 2017.

2. The claimant has not engaged in substantial gainful activity since October 19, 2016, the alleged onset date (20 C.F.R. §§ 404.1571, et seq., and 416.971 et seq.)

3. The claimant has the following severe impairments: degenerative disc disease of the cervical spine and lumbar spine, and asthma (20 C.F.R. § 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. § 404.1567(b) and 416.967(b) except she can lift and carry 20 pounds occasionally and ten pounds frequently, stand or walk six hours in [an] eight-hour workday, and sit for six hours in an eight-hour workday. She can never climb ropes, ladders or scaffolds, but otherwise occasionally climb, balance, stoop, kneel, crouch and crawl. She cannot be exposed to hazardous conditions, such as heights or dangerous moving machinery. She can have no more than occasional exposure to excessive pulmonary irritants, vibration and extreme changes in temperatures, including cold, heat and humidity.

6. The claimant is capable of performing past relevant work as a packing and shipping clerk, telephone order clerk, wire cutter and hand gluer. This work does not require performance of work-related activities precluded by the claimant's residual functional capacity (20 C.F.R. § 404.1565 and 416.965).

7. The claimant has not been under a disability, as defined in the Social Security Act, from October 19, 2016, through the date of this decision (20 C.F.R. §§ 404.1520(f) and 416.920(f)).

Tr. at 595–607.

## Standard Of Review

The Court must determine whether the Commissioner's decision is free from legal error and supported by substantial evidence. Wall v. Astrue, 561 F.3d 1048, 1052 (10th Cir. 2009). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. (quoting Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007)). It requires "more than a scintilla, but less than a preponderance." Id. (quoting Lax, 489 F.3d at 1084).

Evidence is not substantial if it is "overwhelmed by other evidence in the record or constitutes mere conclusion." Grogan v. Barnhart, 399 F.3d 1257, 1261–62 (10th Cir. 2005) (quoting Musgrave v. Sullivan, 966 F.2d 1371, 1374 (10th Cir. 1992)). To determine if the decision is supported by substantial evidence, the Court will not reweigh the evidence or retry the case, but will examine the record as a whole, including anything that may undercut or detract from the Commissioner's findings. Flaherty v. Astrue, 515 F.3d 1067, 1070 (10th Cir. 2007).

## Analysis

Plaintiff bears the burden of proving disability under the SSA. See Ray v. Bowen, 865 F.2d 222, 224 (10th Cir. 1989). The SSA defines "disability" as the inability to engage in any substantial gainful activity for at least 12 months due to a medically determinable impairment. See 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant is under a disability, the Commissioner applies a five-step sequential evaluation: (1) whether the claimant is currently working; (2) whether the claimant suffers from a severe impairment or combination of impairments; (3) whether the impairment meets an impairment listed in Appendix 1 of the relevant regulation; (4) whether the impairment prevents the claimant from continuing her past relevant work; and (5) whether the impairment prevents the claimant from doing any kind of work. See 20 C.F.R. §§ 404.1520(a)(4), 416.920. If the claimant satisfies steps one, two and three, she will automatically be found disabled; if the claimant satisfies steps one and two, but not three, she must satisfy step four. If step four is satisfied, the burden shifts to the Commissioner to establish that the claimant can perform work in the national economy. See Williams v. Bowen, 844 F.2d 748, 751 (10th Cir. 1988).

The ALJ denied benefits at step four, finding that plaintiff can perform past relevant work. Plaintiff argues that the ALJ's residual functional capacity determination ("RFC") is not supported

by substantial evidence.

The ALJ must assess RFC based on all relevant evidence in the record, including information about individual symptoms and any "medical source statements," i.e. opinions by medical sources regarding what plaintiff can do despite her impairments. Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *2, 7 (July 2, 1996). As part of the narrative discussion of the RFC assessment, the ALJ must explain how she considered and resolved any material inconsistencies or ambiguities in the evidence. Id. at *7. The RFC assessment must always consider and address medical source opinions. Id. If the RFC assessment conflicts with an opinion from a medical source, the ALJ must explain why she did not adopt the opinion. Id. In making this decision, the ALJ must consider all the evidence, and discuss the evidence supporting her decision, the uncontroverted evidence upon which she chooses not to rely and significantly probative evidence she rejects. Clifton v. Chater, 79 F.3d 1007, 1009–10 (10th Cir. 1996).

In determining plaintiff's RFC, the ALJ gave great weight to Dr. Coleman's opinion because she found that it was consistent with plaintiff's medical record. Tr. at 604. Specifically, the ALJ noted that while plaintiff's MRI showed evidence of cervical and lumbar degenerative disc disease, plaintiff retained the ability to walk "with a normal and unassisted gait," and maintained full or reduced strength and "intact sensation with regard to spinal impairments." Id. The ALJ also gave great weight to Dr. Salinas's opinion for "the same reasons discussed regarding Dr. Coleman's opinion." Id. at 605. Finally, the ALJ noted that plaintiff's improvement with Mobic[2] weakened her claims of disabling pain despite treatment. Id. at 604.

In determining plaintiff's RFC, the ALJ also considered the medical source statements by

---

[2] From the record, Mobic appears to be a medication. Tr. at 3707–08.

PA Marshall.  Id. at 605–06.  In all, the ALJ gave PA Marshall's medical source statements little weight.  The ALJ gave PA Marshall's first medical source statement little weight because the ALJ found it "internally inconsistent."  Id. at 605.  Specifically, the ALJ stated that while PA Marshall found that plaintiff could sit for eight hours during a normal workday, PA Marshall also stated that plaintiff would need unscheduled breaks in excess of a 15-minute break in the morning and in the afternoon.  Id.  The ALJ gave PA Marshall's second and third opinions little weight "for the same reason discussed regarding Dr. Coleman's opinion."  Id.

Plaintiff argues that the RFC is not supported by substantial evidence because the ALJ relied on the outdated medical opinions of Dr. Coleman and Dr. Salinas to create the RFC.[3]  Plaintiff notes that Dr. Coleman and Dr. Salinas gave their opinions before PA Marshall twice reduced her opinion of plaintiff's exertional and vocational capabilities.  Id. at 605, 2077, 3850.  Indeed, more than a year passed between the date that Dr. Coleman and Dr. Salinas gave their opinions and the date that PA Marshall gave her third opinion.[4]  Moreover, Dr. Coleman and Dr. Salinas gave their statements before plaintiff's MRI in March of 2018 which revealed "advanced multilevel degenerative changes of the cervical spine, spinal canal stenosis at multiple levels, significant spinal canal stenosis at C5-C6, and compromise of the neural foramen with nerve impingement at multiple levels."  Tr. at 2987.

---

[3]  Plaintiff also argues that Dr. Coleman's opinion should be given less weight because Dr. Coleman did not examine plaintiff and simply reviewed available records.

[4]  Defendant argues that PA Marshall is not a "treating source" because she is not considered an acceptable medical source under 20 C.F.R. § 404.1502(a).  While PA Marshall may not qualify as a "treating source" in applications filed before March 27, 2017, the ALJ must still consider her opinions, and her opinions can inform whether the ALJ decision is supported by substantial evidence.  See 20 C.F.R. § 404.1527(f); Flaherty, 515 F.3d at 1070 (court must "examine the record as a whole, including anything that may undercut or detract from the ALJ's findings").

Plaintiff argues that the ALJ's discussion of these developments does not remedy her reliance on Dr. Coleman and Dr. Salinas' opinions. Specifically, plaintiff argues that the ALJ's opinion does not explain why walking with an unassisted gait, exhibiting full or reduced strength and intact sensation with regard to spinal impairments overcomes plaintiff's continual decline in vocational and exertional capabilities.

The Court finds that the ALJ's RFC analysis was not supported by substantial evidence. The ALJ relied largely on the opinions of Dr. Coleman and Dr. Salinas because she found them consistent with the medical record. After Dr. Coleman and Dr. Salinas made their findings, however, plaintiff's abilities declined, as evidenced by plaintiff's MRI in March of 2018 and PA Marshall's opinion in October of 2018. The ALJ did not explain how the earlier opinions and documents that she cited outweighed the later evidence of plaintiff's decline.

Moreover, it is especially important that Dr. Coleman was unable to review plaintiff's MRI from March of 2018. Dr. Coleman, who evaluated plaintiff approximately four months after Dr. Salinas evaluated her, found that plaintiff had lost certain capabilities between Dr. Salinas' evaluation and his own evaluation. Dr. Coleman attributed the difference to an MRI that plaintiff had in the intervening period, which showed degenerative disc disease of the lumbar spine. Id. at 710 ("At recon there is a new MRI of the abdomen that shows [degenerative disc disease] of the lumbar spine [. . .] With the findings on MRI the [plaintiff's] lifting is further reduced to 20/10 and limitations in bending and stooping were given").[5] Thus, it is not immediately clear that Dr. Coleman would have the same opinion of plaintiff's capabilities if he were able to evaluate plaintiff's current medical record.

---

[5] Dr. Coleman's reference to an intervening MRI is unclear. Plaintiff had an MRI on May 4, 2017 and another MRI on June 21, 2017. The MRI report in May discusses her spine, and the MRI report in June largely discusses plaintiff's renal stones. Tr. at 2965, 2972.

The ALJ's discussion of plaintiff's MRI from March of 2018 does not remedy her reliance on Dr. Coleman's opinion.  While the ALJ noted that MRI, she found that plaintiff's improvement with Mobic, declination of further treatment, normal gait, good range of motion and full muscle strength supported an RFC of light work despite the degenerative changes in plaintiff's spine.  Id. at 603–04.  However, only two of the documents on which the ALJ relied to make this determination are dated after plaintiff's MRI in March of 2018.  Id. at 604.  PA Marshall's third opinion postdates all the documents on which the ALJ relied in making this determination.  Id.  The ALJ did not explain why earlier documents that support her opinion are due more weight than later documents that do not support her opinion.  Indeed, the ALJ essentially says that because earlier documents do not support later documents, the later documents should not be relied upon.  This makes no sense if plaintiff's condition has been continually declining.  Id. at 636, 644.

Additionally, the record is not clear that plaintiff, in fact, has a normal gait today.  On May 1, 2019, plaintiff told her doctor that she was experiencing worsening pain and numbness that was not helped by anything. Id. at 561.  The doctor noted that plaintiff had a gait problem, required a cane to walk and was only able to get onto the exam table with the use of a step stool.  Id. at 562.  Thus, as a factual matter, it is unclear whether plaintiff's gait is in fact steady.

**IT IS THEREFORE ORDERED** that the final decision of the Commissioner is **REVERSED and REMANDED** pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings consistent with this memorandum and order.

Dated this 15th day of April, 2021 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge
